### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

BLANCHE ELIZABETH HECKER,
ADMINISTRATOR OF THE ESTATE OF
MICHAEL STEWARD HOFFLER,
DECEASED,

         Plaintiff,                            Case No: 2:19cv373

v.

WESTERN TIDEWATER REGIONAL
JAIL AUTHORITY, *et al.*

         Defendants.

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
### DEFENDANTS' MOTION TO DISMISS

COMES NOW Plaintiff Blanche Elizabeth Hecker, Administrator of the Estate of

Michael Steward Hoffler, Deceased, by counsel, and for her Memorandum in Opposition to

Defendants Western Tidewater Regional Jail Authority ("WTRJA"); Alex P. Taylor, MD;

Tiffany D. Harrell, LPN; and Freida R. Thomas, LPN's Motion to Dismiss, states:

Defendants WTRJA; Taylor, MD; Harrell, LPN; and Thomas, LPN seek to dismiss,

under Federal Rule of Civil Procedure 12(b)(6), claims against them related to Michael Hoffler's

death while held in custody at WTRJA's facility Western Tidewater Regional Jail ("WTRJ" or

"the Jail").  Specifically, WTRJA moves to dismiss Plaintiff's negligence claims on the basis of

sovereign immunity, and alleged failure to prove gross and willful and wanton negligence.

Contrary to its arguments, WTRJA is not entitled to sovereign immunity.  In support of its

motion, WTRJA includes citations to the few state and federal cases that have found regional jail

authorities in Virginia to have sovereign immunity, but does not attempt to distinguish, let alone

discuss, *some* of the cases going the other way. Defendants also fail to mention that just six

months ago, this Court held in *Thrower v. Correct Care Solutions* that the Hampton Roads

1

Regional Jail Authority was not entitled to sovereign immunity. Faced with similar argument to the one Defendants advance here, by their shared attorney, Judge Allen ruled that the regional jail authorities are not entitled to sovereign immunity because they do not fit the definition of a municipal corporation in Virginia. WTRJA cites absolutely no basis why this Court's previous ruling in *Thrower* or the rulings of numerous other courts are incorrect or how cases cited by WTRJA are dispositive of the issue.  This Court should deny WTRJA's motion to dismiss. Defendants Taylor, MD; Harrell, LPN; and Thomas, LPN's Rule 12(b)(6) claims are similarly without basis.  Plaintiff has asserted plausible and legally viable claims against these defendants and, thus, their motion should also be denied.

### Facts

Early in the morning on October 19, 2018, Michael Hoffler was found at WTRJ "laying on floor in coffee ground sputum."  He would be pronounced dead within the hour. ¶¶ 98, 102. Hoffler died as a result of a perforated gastric ulcer that leaked *two liters* (half a gallon) of purulent fluid into his peritoneal cavity and caused necrosis throughout it. ¶¶107-08.  The autopsy report reveals that during the time that Hoffler languished in the WTRJ pleading for medical assistance, purulent fluid continually seeped through the perforations in the lining of his abdomen, causing an acutely dangerous peritonitis and placing him in debilitating pain. ¶6.  In the four days that Defendants had Hoffler in their custody and care, he also lost a staggering 33 pounds. ¶¶ 22, 110.  The markedly abnormal autopsy findings would not occur suddenly after perforation, but rather indicate that Hoffler suffered for an extended period of time between the perforation and his ultimate death. ¶6.

On the morning of October 17, 2018, Hoffler began experiencing serious medical distress. ¶24.  Despite his cries that his "insides" felt like they were "burning," and "on fire," correctional officers ignored Hoffler.  ¶¶26-27.  Hoffler was compelled to kick and scream

underneath the security camera in an attempt to receive help. ¶¶25-28.  Hoffler lay on the floor crying out for help and moaning for an hour as another inmate used a pod microphone to continue to tell the officers Hoffler needed help. ¶¶29-31. Despite these efforts, Hoffler lay in anguish all day, not seeing a medical professional until 5:00 p.m. that evening. ¶34.

It was in this context that Hoffler finally saw Defendant nurse Tiffany Harrell, LPN that evening, October 17.  He told her that he had **pain in his "testicles, then stomach, then appendix, back down to penis."** (emphasis added). ¶35. Nurse Harrell wrote that Hoffler **"presents screaming, outburst, profusely sweating, pale in color, noticeable goose bumps (stating he's hot)."** ¶34. (emphasis added).  During the visit, Nurse Harrell noted that Hoffler kept **"screaming he needs to go to the ER."** ¶38.   She documented that sweat was streaming off of Hoffler's face, he was unable to sit still for more than a few seconds, his pupils were moderately dilated, his nose was runny or tearing, he was "obviously" irritable or anxious, and had "prominent" gooseflesh. ¶37. She noted a "possible hernia" to the abdomen. ¶38.  But Nurse Harrell did not palpate Hoffler's abdomen.  She also did not mark any GI upset in her notes. ¶39, 42.  Nor did Nurse Harrell call 911.  Instead, she merely offered Hoffler Gatorade. ¶40.

***Nothing about Hoffler's dire presentation improved*** upon receipt of the Gatorade. Instead, Hoffler still presented with sweat streaming off his face, he was unable to sit still for more than a few seconds (undoubtedly caused by the "fire" he felt in his "insides"), his pupils remained moderately dilated, his nose was runny or tearing, he was "obviously" irritable or anxious, and he had "prominent" gooseflesh. ¶41.  Moreover, Hoffler thereafter stated that he felt like **he could not breathe**. ¶ 43.  In response, Harrell gave Hoffler, a person in acute distress, the over-the-counter pain reliever Motrin. ¶44.  ***Nothing would improve*** for Hoffler despite the provision of the Motrin. ¶49.

Nurse Harrell did finally contact Defendant Taylor, MD after, as a licensed practical nurse, deciding on her own to give Hoffler Gatorade and Motrin.  However, Dr. Taylor did not come to see Hoffler, nor did he order Nurse Harrell to palpate Hoffler's abdomen, do blood tests, send Hoffler to the hospital, or take any further action. ¶¶46-47.  Instead, Dr. Taylor merely ordered that Hoffler be placed in a camera cell and monitored.  These actions *did not provide Hoffler with care or treatment for his already acute condition*; they only succeeded in removing him from the medical department, still in unresolved acute distress. ¶47. Per Nurse Harrell, when Hoffler was placed in a camera cell, she saw him **"sticking fingers down his throat trying to make himself vomit."** (emphasis added).  Hoffler's actions were indicative of his *ongoing* distress.  But Harrell took no action to help; she simply left a patient still in acute distress. ¶49.

During the night of October 17 through the morning of October 18, Hoffler was supposed to be under "Close Observation" in his camera cell. ¶56.  However, Defendant Freida Thomas, LPN made only one entry for Hoffler.  Her entry, for which no date or time is listed, appears from its location in the log to have been made at some point between 5:35 p.m. on October 17, 2018 and 7:15 a.m. on October 18, 2018.  ¶57.  Thomas did not mark any symptoms on Hoffler's COWS protocol record[1], nor did she derive a COWS score.  She also did not document any description of Hoffler's presentation or efforts to provide him actual treatment. *Id.*  Medical records recorded before Thomas's (ending in Hoffler's being cast off to a camera cell still in acute, obvious distress and copiously sweating) and after Thomas's (as described below, when Hoffler's pain pushed him to self-harm and he was seen extremely tachycardic, in "distress," and in "pain") indicate that Hoffler was in distress and his condition acute when Thomas saw him. ¶¶ 34-35, 37, 41, 43, 58, 61-63.  Indeed, the pathogenesis of Hoffler's peritonitis on autopsy

---

[1]  Hoffler had been taking methadone for addiction treatment prior to being detained at the WTRJ and was put on a COWS opiate withdrawal protocol at the Jail (upon information and belief, the Jail does not prescribe methadone). ¶¶37, 45.

indicates that the perforation and leaking of purulent fluid was present for a considerable period of time prior to his death (as his extreme distress confirms).  ¶¶6, 50-51.  The pain that Hoffler would have felt – which he had described as "burning" and "on fire" – as digestive fluid continually dumped out and attacked his abdominal cavity, cannot be understated.  But Thomas showed such disregard to Hoffler that she did not record complete or accurate records, failed to call 911, failed to call Dr. Taylor, and failed to provide Hoffler with any treatment for his condition. ¶¶57, 126 a. and c.

Indicative of his ongoing serious medical condition, the next morning, October 18, 2018, Hoffler was found with "a bed sheet tied around the cell gate and loosely tied around his neck." ¶58. The Medical Examiner's report and Hoffler's clinical history demonstrate that he would have been in excruciating pain at the time. ¶58.  His untreated peritonitis was causing digestive juices and food to continue to seep unnaturally into his abdominal cavity, eroding away at tissue and causing infection.  *Id*.  However, while Hoffler was placed on suicide precautions, no suicide watch reports could be found in the medical records. ¶59.  Moreover, defendant medical providers continued to dismiss Hoffler's serious condition and distress, and the likely linkage between such and his self-harm actions.

Nurse Harrell saw Hoffler at about 7:15 a.m. on October 18.  She recorded a heart rate of 143, which is far above a normal level and indicates tachycardia. ¶61.  Harrell further described Hoffler as being "in distress" and sweating.  She documented that he stood up complaining of pain as soon as she approached his cell.  ¶¶62-63.  But Harrell did not contact Dr. Taylor, despite Hoffler's tachycardia, complaints of pain, distress, sweating, and her further observations that Hoffler had possibly enlarged pupils and his movement was frequently shifting / extraneous. ¶¶63-64.  Nurse Harrell rechecked Hoffler's pulse at 12:30 p.m., *but it was still tachycardic* at 114 and *she again dismissed the condition. Harrell again failed to contact Dr. Taylor*. ¶65-66.

Hoffler also received *no treatment* from Nurse Harrell. Nurse Harrell further recorded that she would "continue to monitor" Hoffler. ¶67. However, the next monitoring record does not appear until 6:57 p.m., about **six and a half hours** later. ¶67.  Harrell abandoned Hoffler for hours as he lay in his cell, acutely suffering.

When Harrell saw Hoffler next, at about 6:57 p.m. on October 18, 2018, she again dismissed his acute condition and focused on checking off the boxes of her routine duties. Hoffler, like *all* new jail inmates on intake, had previously been given a PPD test. ¶68.  A PPD test is a standard jail test to determine if a new inmate has the infectious disease tuberculosis. Harrell read the test, confirming it was negative, but ignored Hoffler's actual, then-present and acute condition. *Id*.

Indeed, the next time Harrell saw Hoffler shortly thereafter at 7:20 p.m. on October 18, it was because he had been brought from his cell to Medical "to be assessed for pain" – pain that Harrell had not addressed when seeing him shortly before. ¶69.  Harrell again dismissed Hoffler's pain, noting that he was "*still* complaining" (emphasis added) of pain in the testicles. ¶69. Nurse Harrell gave Hoffler Gatorade and a fruit cup, with no documentation as to why she offered him fluids (and certainly no order from a physician). ¶70. Once again, she did not palpate or in any other way examine Hoffler's abdomen when such was indicated by Hoffler's symptoms. *Id*.  Moreover, if Harrell actually observed Hoffler consume fluids, as indicated in her notes (she documents what Hoffler purportedly consumed), s*he would have observed an intense reaction by him.  Id.* The provision of fluids added more content to be leaked into Hoffler's abdominal cavity and feed his deadly, inflamed, and infectious peritonitis, which was breaking down his tissue.  Such would have caused more obvious, intense pain, and would have further indicated the extremely acute nature of his condition. ¶¶70, 58.  But Harrell did not document such a reaction by Hoffler to fluids or provide the information to Dr. Taylor. ¶70.  Harrell thus

appears to have completely disregarded Hoffler's reaction to her elected treatment, dismissing his condition once again.

Hoffler then again told Harrell that he was having **difficulty breathing**.  Nurse Harrell wrote that she called Dr. Taylor, but documented only that Dr. Taylor would see Hoffler at that night's clinic. ¶¶71, 73.  Dr. Taylor did not come in to see Hoffler, a patient in acute pain who was having trouble breathing and whose condition had not been diagnosed.  Harrell thereafter gave Hoffler an Albuterol breathing treatment, but did not record that Dr. Taylor ordered the treatment, indicating that she may have again elected a treatment not ordered by a doctor. ¶73.  Moreover, thereafter, Harrell returned Hoffler to his cell, and there is no record of her or anyone else seeing him again until hours later, at 11:00 p.m. (when Defendant John/ Jane Doe disregarded his distress and symptoms).  ¶¶74, 75-78.  Harrell did not monitor or keep in the Medical Department a patient in acute distress that the doctor was not seeing promptly and whose condition had only worsened before her.

At 11:00 p.m. on October 18, Defendant John/Jane Doe made an entry in Hoffler's COWS record. No blood pressure is recorded and a dash (-) is recorded for resting pulse. ¶75.

Dr. Taylor finally saw Hoffler at 12:10 a.m. on October 19, 2018. ¶79. Dr. Taylor noted that Hoffler "[h]as several complaints of pain," but did not bother to describe or analyze any of them.  He noted that Hoffler was "volume contracted."  Moreover, Dr. Taylor wrote that he was "**unable to get manual BP**." [blood pressure] ¶¶80-82 (emphasis added).  The failure to obtain a reading indicates that Hoffler's blood pressure **was so dangerously low that it could not be discerned manually with a blood pressure cuff**. ¶82.  Inability to obtain a blood pressure is an emergency; a person whose blood pressure is so low it cannot be discerned requires emergent transport to an Emergency Department for evaluation and treatment.  *Id.*  Dr. Taylor also did not make a reading of Hoffler's pulse, and the last vital signs available to Taylor also show no pulse

reading. ¶83. The inability to obtain a blood pressure reading or a pulse, Hoffler's pain and extreme symptoms, and the Medical Examiner's findings regarding the extent of his peritonitis indicate that Hoffler was *in extremis* – he was *dying* – when Dr. Taylor saw him.  Hoffler's condition could not be treated at the jail; he needed immediate transport to a hospital.  ¶82, 84.

Dr. Taylor further wrote that Hoffler's abdomen was allegedly positive for bowel sounds. However, Hoffler would be dead with widespread, extensive peritonitis later that same morning. Hoffler's clinical presentation and his later autopsy indicate that he did not actually have bowel sounds at the time, but had an acute surgical abdomen. ¶85.  An acute surgical abdomen, as the name indicates, is a dangerous abdominal condition requiring evaluation at a hospital Emergency Department for emergency abdominal surgery. ¶¶ 53-54. Dr. Taylor also did not document performing any physical palpating of Hoffler's abdomen or tests for abdominal guarding or rebound tenderness. ¶86.  Nor did he order any blood or urine tests. ¶86.  Dr. Taylor either did not truly assess Hoffler's bowel sounds at all or knowingly performed a patently deficient exam.

In response to Hoffler's dire presentation, Dr. Taylor did not send Hoffler to the hospital. ¶82.  He completely disregarded the extreme danger to Hoffler in ignoring the inability to obtain a blood pressure or pulse, and in failing to address Hoffler's extremis. ¶¶84, 126b.  Moreover, while the one treatment Dr. Taylor ordered was IV fluids, he did not make any attempt to give Hoffler fluids – intravenously or orally – while Hoffler was actually in Medical with Dr. Taylor. ¶88.  Instead, Dr. Taylor sent Hoffler back to his cell with his dangerously low blood pressure and pulse – and went home.  It would be *over 2.5 hours later* – at 2:47 a.m. on October 19 –that Defendant LPN Nurse Moore[2] would make two different attempts to start the IV, attempts that were unsuccessful.  Dr. Taylor thus left a licensed practical nurse, a person with licensure and

---

[2]  Defendant Nurse Moore was served at WTRJ on the same date as moving Defendants Harrell and Thomas, but Moore has not filed responsive pleadings to date.

experience well below that of a physician, nurse practitioner, or registered nurse, to attempt to start an IV at a jail by herself, at some point well after he had left the building, and Hoffler languished in his cell with a dangerously low, unreadable pulse and blood pressure in the meantime.  Moore never did start the IV to Hoffler and he never received the IV fluids. ¶¶91-93.

Hoffler would thereafter be found "laying on floor in coffee ground sputum" on the morning of October 19, 2018. ¶¶96-98.  The "coffee ground" description indicates blood in Hoffler's vomit. ¶1.  Nurse Moore wrote that Hoffler was "placed in a wheelchair to transported to medical," where he received oxygen via nasal canula and an IV was attempted to be placed – not actually placed – in his forearm. ¶¶99-100.  **No effort to perform CPR is described**. ¶100. In contrast, EMS records state that when EMS arrived at Hoffler, *no* interventions were ongoing. ¶101. They describe Hoffler as "seated in wheel chair with jail nurse holding his/ supporting his head…skin was bluish/gray and purple color. Lower extremities has some mottling of skin and lividity setting in." ¶101.  EMS pronounced Hoffler deceased at the Jail at 6:50 a.m. on October 19, 2018. ¶102.  Nurse Harrell called Dr. Taylor to notify him of the "incident" of Hoffler's death at "Approx. 0703." ¶104.  On autopsy, Hoffler was described as "markedly thin, nearly cachectic" at 107 pounds and BMI 17, having lost 33 pounds of weight during his short incarceration. ¶110.  His cause of death was "PERFORATED GASTRIC ULCER." ¶107.

Hoffler's circumstances also indicate that WTRJ's correctional officers disregarded Hoffler on the evening before and the morning of his death, notwithstanding both their regular rounding duties and Hoffler's suicide watch status.  ¶106.  Despite his open and obvious signs of serious illness including vomiting, lying in his own bloody vomit, and becoming unresponsive, Hoffler was permitted to deteriorate to the point of being minutes from death before correctional officers called Medical. *Id.*

Hoffler's condition could have been corrected with simple, routine surgery. ¶111. But for the acts and omissions of Defendants, Hoffler would not have died on October 19, 2018. *Id.*

## ARGUMENT

### A.    Standard of Review

To satisfy Federal Rule of Civil Procedure 8(a)(2), a complaint simply must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A Rule 12(b)(6) motion "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter…to state a claim to relief that is plausible on its face." *Acorn Land, LLC v. Balt. County*, 402 Fed. Appx. 809, 816 (4th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A motion to dismiss for failure to state claim may only be granted if "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitled him to relief." *Slade v. Hampton Rds. Reg'l Jail*, 407 F.3d 243, 248 (4th Cir. 2005) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).

### B.    WTRJA Is Not Entitled to Sovereign Immunity on Plaintiff's Negligence Claims

WTRJA argues that it is entitled to sovereign immunity under state law, and, therefore, the negligence claims in Counts I, II, and III should be dismissed. Br. at 4-8. This claim contradicts the clear instructions of the Virginia General Assembly and should be rejected.

#### 1.    WTRJA is Not a Municipal Corporation and Not Entitled to Sovereign Immunity

The Virginia doctrine of sovereign immunity bars state law tort claims against the Commonwealth of Virginia without its consent. *Niese v. City of Alexandria*, 264 Va. 230, 238

(2002).  The doctrine protects not just the Commonwealth itself, but also immunizes nonconsenting counties and "municipal corporations."  *City of Richmond v. Richmond Met. Auth.*, 210 Va. 645, 646 (1970).  The Virginia Supreme Court has "set out the two basic factors" to consider when "determining whether or not a particular entity is in fact a municipal corporation." *Id.*  The two-step process outlined by the Supreme Court involves asking first "how many attributes of a municipal corporation does the entity in dispute possess?" *Id.*, and second, "what is the particular purpose for which it is sought to determine whether or not a municipal corporation is present?" *Hampton Roads Sanitation Dist. Comm'n v. Smith*, 193 Va. 371, 376 (1952). WTRJA's argument fails at both steps.

Addressing the first point, WTRJA has only four of the six attributes "deemed **essential** to viability as a municipal corporation" as set out by the Virginia Supreme Court. *City of Richmond*, 210 Va. at 647 (emphasis added). First stated in *Hampton Roads* and later summarized in other cases, the attributes are:

(1)  Creation as a body corporate and politic and as a political subdivision of the Commonwealth;
(2)  Creation to serve a public purpose;
(3)  Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenue, personal, and real property;
(4)  Possession of the power of eminent domain;
(5)  Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state;
(6)  Management of the corporation vested in a board of directors or a commission.

*City of Richmond*, 210 Va. at 647.[3]

---

[3]  *Compare York Cty. v. Peninsula Airport Comm'n*, 235 Va. 477, 481 n.1 (1988) (arguing that an entity may be a municipal corporation "if it possesses enough of the essential attributes") *with Hauth v. Se. Tidewater Opportunity Project, Inc.*, 420 F. Supp. 171, 173-74 (E.D. Va. 1976) (rejecting the argument that not all six attributes are required in each instance). Notably, even if all six attributes are not required, the WTRJA's lack of eminent domain power and its lack of political subdivision status render it not a municipal corporation in this context, where a question of substantive law is involved.

Applying these factors to the list of *thirteen* separate powers and attributes of a regional jail authority set out by the Virginia General Assembly, it is clear that WTRJA lacks two of the essential attributes of a municipal corporation—the designation as a "body corporate and politic and political subdivision" and "the power of eminent domain." *See* Va. Code. Ann. § 53.1-95.7. These omissions cannot be glossed over.  When the General Assembly "has used words of a plain and definite import the courts cannot put upon them a construction which amounts to holding the legislature did not mean what it has actually expressed." *Barr v. Town & Country Props., Inc.,* 240 Va. 292, 295 (1990).  However, that is exactly what the Defendants are asking this Court to do—add words to a statute that the General Assembly did not include.  Such rewriting of law is, respectfully, beyond the province of the courts.  As the Virginia Supreme Court stated, "it is well-settled that when the language of a statute is unambiguous, we are bound by the plain meaning of that language." *Commonwealth v. Leone*, 286 Va. 147, 151 (2013).

In the specific context of political subdivisions, the Virginia Supreme Court further has noted that "the General Assembly clearly knows how to denominate an authority as a 'political subdivision' when it wishes to do so." *Short Pump Town Ctr. Cmty. Dev. Auth. v. Hahn*, 262 Va. 733, 746 (2001).  The General Assembly chose not to do so in this case, and this Court cannot make that decision for them.  To do so would be to impede on the province of the legislature.  In determining whether the WTRJA is a political subdivision, the court may look "**solely** at the statutory language used in the [WTRJA's] establish legislation, **not** at the [WTRJA's] attributes." *Short Pump*, 262 Va. at 745 (emphasis added).

Likewise, the Court may not imply a power of eminent domain for the WTRJA. In Virginia, when construing "statutes conferring the power of eminent domain, every reasonable doubt is to be [resolved] adversely to th[at] right." *PKO Ventures, LLC v. Norfolk Redevelopment & Hous. Auth.*, 286 Va. 174, 182 (2013) (citing *School Board v. Alexander*, 126

Va. 407, 413 (1919)) (alterations in original).  An entity cannot exercise eminent domain powers "unless both the spirit and letter of the statute clearly confer the power," and the entity "must comply fully with the statutory requirements when attempting to exercise this right. *Id.* (quoting *School Board*, 126 Va. at 413; *3232 Page Ave. Condo. Unit Owners Ass'n v. City of Va. Beach*, 284 Va. 639, 645 (2012)).  The WTRJA's lack of eminent domain power is telling, as "the power of eminent domain is a hallmark feature of a municipal corporation." *Thornhill v. Aylor*, No. 3:15-CV-00024, 2017 U.S. Dist. LEXIS 80330 *9 (W.D. Va. May 25, 2018); *see also Finamore v. Trent*, 95 Va. Cir. 38, 42 (2016) ("The two missing attributes—designation as a body politic and vesiture with the power of eminent domain—are fundamental attributes of a municipality.").

As to the second point, the purpose for which a determination is sought, even if the WTRJA in some circumstances may be considered a municipal corporation, this case is not such a circumstance.  *See Hampton Roads*, 193 Va. at 377 (an entity "may be held to be a municipal corporation for some purposes, but not for others."). When municipal corporation status is invoked to resolve a procedural issue, "there is more of a likelihood of holding an agency to be a municipal corporation…than there is when a question of substantive law is involved." *Id*. at 377. (internal citations omitted). The issue here is quintessentially one of substantive law. *See Heywood v. Virginia Peninsula Reg'l Jail Auth.*, No. 2:15CV195, 2015 U.S. Dist. LEXIS 112517 * 16 (E.D. Va. July 21, 2015) ("Undoubtedly, the application of the doctrine of sovereign immunity…involves a question of substantive law.") (internal citations omitted). This militates against labeling the WTRJA as a municipal corporation for the purpose sought by Defendants.

Many courts have addressed this issue and reached the conclusion that regional jails in Virginia do not enjoy sovereign immunity for tort claims.  *See Thornhill v. Aylor,* No. 3:15-CV-00024, 2017 U.S. Dist. LEXIS 80330 *5 (W.D. Va. May 25, 2017) (rejecting a motion for

13

certification because "three federal district courts and one Virginia Circuit Court have

determined that regional jail authorities are not entitled to sovereign immunity under the laws of

Virginia.").  When asked to reconsider in light of the *Haleem* decision, which granted sovereign

immunity to a Virginia regional jail authority, the *Thornhill* court noted that even in light of that

decision, "the weight of the authority remains consistent with this court's ruling." *Thornhill v.*

*Aylor*, No. 3:15-CV-00024, 2017 U.S. Dist. LEXIS 172905 *7 (W.D. Va. Oct. 19, 2017).

A district judge in the Eastern District of Virginia also reached the same conclusion

earlier this year in a case in which WTRJA's counsel made a sovereign immunity argument on

behalf of another jail authority defendant, the Hampton Roads Regional Jail Authority

("HRRJA").  *See* attached **Exhibit A**, Order in *Thrower v. Correct Care Solutions, et al,* Civil

Action No. 2:18cv56 (E.D. Va. April 3, 2019).  In ruling that the HRRJA was not entitled to

sovereign immunity, Judge Allen cited in *Thrower* the reasoning of *Heywood v. Va. Peninsula*

*Reg'l Jail Auth*., in which the court found that a regional jail authority was not entitled to

sovereign immunity because the factors that it possessed were unimportant compared with those

that it lacked (eminent domain and designation as a political subdivision).  No. 2:15cv195, 2015

WL 5026188 (E.D. Va. Aug. 21, 2015).  As quoted by Judge Allen in *Thrower*, the court in

*Heywood* had noted:

> most of the attributes which [the jail authority] does enjoy are found in private
> corporations as well.  Fully private jails have the power to sue and be sued, to enter into
> contracts, to hold and dispose of real and personal property, to borrow money and issue
> bonds, and to manage their affairs by a board of directors.

*Heywood*, 2015 WL 5026188, at *6.

Judge Allen concluded that "The authority possessed by the HRRJA does not differ in a

meaningful way from a private corporation." Ex. A, *Thrower* at p. 9.  Determining that the

"primary factors that separate a municipal corporation from a private entity are the designation as

a body politic and the power of eminent domain," Judge Allen noted that those factors "are

missing" with regard to a regional jail authority. *Id.* Judge Allen further wrote that "This Court declines to guess at the General Assembly's intentions in not designating jail authorities as a political subdivision." *Id*.

In an order issued just today, Judge Allen again ruled that the HRRJA is not entitled to sovereign immunity. *See* attached **Exhibit B**, Order in *Keeling v. Correct Care Solutions, et al*, Civil Action No. 2:19cv225 (E.D. Va. September 23, 2019). Citing the Court's decision in *Thrower*, the Court wrote:

> This Court has held that HRRJA is not entitled to sovereign immunity because it is not a municipal corporation. ... Nothing in the instant case compels a different conclusion. HRRJA's authority does not differ in a meaningful way from a private corporation; therefore, it is not entitled to sovereign immunity. ...

> Ex. B at p. 3. (internal citations omitted).

In contrast, the cases to have reached the opposite conclusion, like those cited by Defendants, have all done so by arguing that the plain text of the Virginia statutes do not mean what they say. Respectfully, while the courts in those cases may have set forth bases that seem logical or appropriate to them, they have acted beyond the domain of the judiciary in disregarding the words that the legislature actually wrote and made into law. *See, e.g.*, *Lassiter v. Shabazz-Wiggins*, Circuit Court of the City of Suffolk (July 16, 2019) (agreeing with Judge Farmer's reasoning in the *Artis* case, and stating regional jail authorities should have the sovereign immunity possessed by cities, counties, and political subdivisions because "it would make sense" for the Commonwealth to encourage the creation of regional jail authorities); *Costine v. Correct Care Sols., LLC*, 2019 U.S. Dist. LEXIS 110916 *16 (E.D. Va. July 2, 2019) (adopting the reasoning from *Dowdy*); *Artis v. Scotting*, Circuit Court of the City of Suffolk, CL18-527 (Feb. 12, 2019) (holding that regional jail authorities have the same immunity that separate local jails have because to hold otherwise "doesn't make any sense to me"); *Wendt v. Overton*, 98 Va. Cir. 220, 222 (2018) (admitting that the regional jail in question "was not

created as a political subdivision" but holding that the "language is similar to the language that the General Assembly uses to create an entity as a political subdivision of (sic) Commonwealth");[4] *Haleem v. Quinones*, No. 5-17-CV-00003, 2017 U.S. Dist. LEXIS 162801 *18 (W.D. Va. Sept. 30, 2017) (concluding that regional jail authorities are entitled to sovereign immunity because to hold otherwise "makes little sense to this court"); *Dowdy v. Pamunkey Reg'l Jail Auth.*, No. 3:14-CV-0003, 2014 U.S. Dist. LEXIS 67127 * 9 (E.D. Va., May 15, 2014) ("While Virginia law does not designate a jail authority as a political subdivision, for all intents an authority runs a jail the same way a city, county, or town would."). As noted above, this view impermissibly expands the role of the courts into making law and violates the plain-language rule of interpretation used in Virginia. *See Leone*, 286 Va. at 151; *see also Virginia Transit Co. v. Tidd*, 194 Va. 418, 425 (1952) ("It is not the function of the court to legislate or to use the office of construction to amend plain statutes.").

      **2.**    **The General Assembly is Aware that Regional Jails do not have Sovereign Immunity, and has Specifically Elected not to Change that Fact**

In one of the cases primarily relied upon by the Defendants, *Haleem v. Quinones*, the district court held that the Virginia legislature's "failure to include the words" necessary to bestow regional jail authorities with immunity makes "little sense" and thus the legislature's true "intent" was to label jail authorities as municipal corporations. 2017 U.S. Dist. LEXIS 162801 at *17. As noted above, this line of reasoning that ignores the plain text of the law to achieve the result deemed most sensible in the eyes of the court contravenes clear instructions from the Virginia Supreme Court and oversteps the role of the judiciary generally. Further, even if this were the role of the courts, evidence exists to show that the General Assembly is *well aware* that

---

[4] The court in *Wendt* cited *Short Pump Town Ctr. Cmty. Dev. Auth. v. Hahn* for that proposition, despite that case's admonition that "the General Assembly clearly knows how to denominate an authority as a 'political subdivision' when it wishes to do so." 262 Va. at 746.

regional jail authorities do not receive immunity and has, in fact, *rejected efforts to change that*. In 2014 and again in 2015, bills were introduced in the General Assembly that would have granted sovereign immunity to regional jail authorities.  *See* H.B. 150, Gen. Assemb., Reg. Sess. (Va. 2014); H.B. 1513, Gen. Assemb., Reg. Sess. (Va. 2015).  Neither bill became law.  As the district court noted in *Thornhill*, the existence of those bills "is a clear indication that the Virginia General Assembly is aware the regional jail authorities do not possess sufficient attributes of a municipal corporation to be vested with sovereign immunity under Virginia law." U.S. Dist. LEXIS 80330 at *10.  Further, "[t]hat the legislature has decided not to extend such protection, or to amend the statute granting the essential attributes of a municipal corporation to regional jail authorities, further demonstrates that these entities do not have such immunity." *Id*.

### 3.  If the WTRJA Does Not Have Sovereign Immunity, then the Individual Defendants Do Not Have It Either

If this Court holds that the WTRJA is not entitled to immunity, then the individual named defendants do not enjoy that protection either.  *See Hill Myrick v. NaphCare, Inc.*, No. 09-2150, 2017 U.S. Dist. LEXIS 120256 *5 (E.D. Va. July 31, 2017). Accordingly, the defendants can be held liable for simple negligence. *Id*.  As the facts above and discussion of gross negligence below demonstrate, Plaintiff has certainly plausibly alleged simple negligence.

### C.  The Plaintiff Has Adequately Alleged Deliberate Indifference

As a preliminary matter, "[p]retrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment." *Young v. City of Mount Rainier*, 238 F.3d 567, 575 (4th Cir. 2001); *see also Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).[5]  The Eighth Amendment protection against cruel and

_____

[5]  The Supreme Court has actually recently suggested that pretrial detainees receive more protection than convicted prisoners.  In *Kingsley v. Hendrickson*, the Court held that "an **objective standard** is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment." 135 S.Ct. 2466, 2476 (2015). (emphasis

unusual punishments is violated when officials exhibit "deliberate indifference to serious

medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A claim based on

deliberate indifference has both an objective and subjective component.  *See Porter v. Clarke*,

923 F.3d 348, 355 (4th Cir. 2019).  To satisfy the objective prong, the plaintiff must show that he

was denied one of the life's minimal necessities, such as medical care.  *See Makdessi v. Fields*,

789 F.3d 126, 133 (4th Cir. 2015).  The subjective prong requires a showing of deliberate

indifference—that the defendants know of and disregard an objectively serious condition. *See*

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The Defendants do not allege that Hoffler did not

have a serious medical need.  Instead, they merely allege that the minimal activities they

undertook are enough to elevate their mindset above deliberate indifference, supporting their

argument with a single and easily distinguished citation.

In *Murray v. Correct Care Solutions, LLC*, the case relied on by the Defendants, the

district court granted a motion to dismiss brought by a defendant doctor because the doctor in

question "learned about [the inmate's] serious medical need from the nurse, and then took

action." No. 3:16-CV-00279, 2017 U.S. Dist. LEXIS 7244 *5 (E.D. Va. Jan. 18, 2017).

Pertinently, the doctor in *Murray* never actually saw the decedent.  Instead, the on-call doctor

was contacted by a nurse over the phone or electronically, and was told about one serious

symptom the decedent then had.  *Murray* is thus very different from Plaintiff's instant case

---

added).  Neither the Fourth Circuit nor the Supreme Court have yet addressed whether this
objective standard also applies to pretrial detainees' claims based on inadequate medical care.
*See Lanier v. Henderson Cnty. Det. Ctr.*, No. 1:15-cv-262, 2016 U.S. Dist. LEXIS 164353 *6 n.
3 (W.D. N.C. Nov. 29, 2016).  However, the Supreme Court never applied the deliberate
indifference standard from *Farmer* to denial of medical care claims by pretrial detainees.
Further, the language utilized in *Kingsley* suggests that claims brought by pretrial detainees for
denial of medical care should be judged based on an objective standard.  *See Kingsley*, 135 S.Ct.
2466, 2473 (2015) (discussing precedent and holding that a "focus on 'punishment' does not
mean that proof of intent (or motive) to punish is required for a pretrial detainee to prevail on a
claim that his due process rights were violated") (citing *Bell v. Wolfish*, 441 U.S. 520, 541-43
(1979)).

against Defendants who *all* physically saw Hoffler during a time when he was exhibiting *multiple* signs and symptoms of serious medical need. Moreover, Nurse Harrell had many interactions with Hoffler and Dr. Taylor was called twice about Hoffler and thereafter personally saw Hoffler in Medical. Hoffler's condition never improved and in fact got worse. In contrast, in *Murray*, after his conversation with the nurse, the doctor "did not receive any updates on [the decedent]." *Murray*, 2017 U.S. Dist. LEXIS 7244 at *3. The situation was different than the instant case wherein Harrell and Taylor were aware of Hoffler declining over time. As part of its discussion of deliberate indifference, the Court in *Murray* concluded that because the doctor in that case had taken action with regard to the one medical issue he knew about, the plaintiffs had not properly alleged deliberate indifference. *Id*.

As discussed below, respectfully, the Court in *Murray* misconstrues the deliberate indifference standard. However, even accepting the *Murray* Court's view of the deliberate indifference standard, Plaintiff has pled sufficient facts to survive a motion to dismiss in this case. The Complaint lays out that Dr. Taylor abandoned Hoffler on October 19 after making no effort to address an acutely dangerous condition that he definitely knew about – that he was unable to obtain a blood pressure from Hoffler, indicating that this vital sign was so low that it could not be discerned, and also could not get a pulse reading – another vital sign - for Hoffler. ¶¶79-90. Dr. Taylor did not even order Hoffler to be kept in the Medical Department, but sent him back to his cell in this emergent state. *Id.* Moreover, Dr. Taylor showed indifference because he made no effort himself to actually give his acutely distressed patient the one treatment he ordered (fluids), but sent Hoffler back to his cell and went home without Hoffler actually receiving anything. Hoffler would languish for over 2.5 hours without even *attempted* administration of the fluids Dr. Taylor ordered. Dr. Taylor simply left an actively dying patient, failing to stabilize him. ¶126 b. With regard to Nurse Harrell, she ignored Hoffler's tachycardia

19

and other symptoms that she knew about on October 18; she failed to notify Dr. Taylor and failed even to provide any treatment herself when she twice measured an abnormal heart rate in Hoffler, and noted that he was also "in distress," "sweating," complaining of pain to her, and his pupils looked abnormal ¶¶61-67.  She did not even "continue to monitor" Hoffler as she indicated that she would; Hoffler went six and a half hours without seeing medical personnel.  *Id.*  And Nurse Thomas made no effort to treat or help Hoffler when seeing him at a time when he was obviously in distress and his condition acute from his untreated peritonitis.  Thomas did not even make complete log entries. ¶¶56-57, 126 a. and c.[6]

Further, despite what Defendants argue, medical professionals in a jail setting cannot avoid deliberate indifference claims just by showing up.  Defendants cite to *Murray* for the proposition that a doctor who learns of a serious medical need, and then acts, cannot be found to be deliberately indifferent, *regardless of the action taken by the doctor*.  Br. at 14.  The Fourth Circuit Court of Appeals case cited by *Murray*, however, *Scinto v. Stansberry*, 841 F.3d 219 (4th Cir. 2016), demonstrates how this line of reasoning is false.  In *Scinto*, the appellate court noted that a jury could not find liability under the Eighth Amendment if a prison official "responds *reasonably* in the face of a known, serious risk of harm to an inmate." *Id.* at 230. (emphasis added).  The test is not merely whether the doctor or official in question responded to the medical need, but whether he or she responded in a reasonable fashion.  To determine otherwise could, respectfully, lead to arguments that a provider was not deliberately indifferent because he provided a band-aid to a hemorrhaging patient or a cold compress to an unresponsive patient.  Or merely ordered monitoring, but did nothing to actually treat an obviously acute condition.  Here,

---

[6]  The Court may find that Nurse Thomas knew of Hoffler's condition from the obvious nature of it.  She "cannot hide behind an excuse that [s]he was unaware of a risk, no matter how obvious." *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

Defendants had a patient who, among other things, they documented as complaining of intense

pain, inability to breathe, screaming, profusely sweating, appearing pale, having dilated pupils,

engaging in self-harm, experiencing tachycardia, appearing "in distress," and finally presenting

with a blood pressure and pulse so low they could not be measured.  But, they not only never

sent him to the hospital, they never stabilized him or improved his condition, but simply pushed

him out of Medical back to his cell multiple times, failing to properly monitor him and, in the

case of Dr. Taylor, simply left the building while he remained in an acute condition.  Such

behavior is clearly indifferent to both Hoffler's serious medical condition and the excessive risk

posed by Defendants' action or inaction.

**D.     Plaintiff's Allegations Sufficiently State a Claim of Gross Negligence Against WTRJA, Dr. Taylor, Nurse Harrell, and Nurse Thomas**

As a preliminary matter, if this Court holds that the WTRJA enjoys the protections of

sovereign immunity, its employees may still be liable for their grossly negligent acts, and the

WTRJA liable under the theory of *respondeat superior*. *See Colby v. Boyden*, 241 Va. 125, 128

(1991) ("In Virginia, a government agent entitled to the protection of sovereign immunity is not

immunized from suit. Rather, the degree of negligence which must be shown to impose liability

is elevated from simple to gross negligence."); *see also Butler v. Southern States Coop. Inc.,* 270

Va. 459, 465 (2005) (holding that an employer is liable for tortious conduct that occurred while

its employee was performing the employer's business and acting within the scope of the

employment).

Gross negligence is "such a degree of negligence as would shock fair minded [people]

although something less than willful recklessness." *Ferguson v. Ferguson*, 212 Va. 86, 92

(1971).[7]  The distinction between "ordinary negligence and gross negligence is one of degree,"

---

[7]  Because gross negligence under Virginia state law requires a lower standard of proof
than deliberate indifference, if Plaintiff has plausibly alleged a Fourteenth Amendment claim,

not one of "kind." *Green v. Ingram*, 269 Va. 281, 292 (2005).  Unlike a § 1983 claim for deliberate indifference, gross negligence claims are evaluated based on an objective, reasonable person standard.  As recently stated by the district court in *Hixson v. Hutcheson*, "[u]nlike deliberate indifference, gross negligence does not require a finding that a defendant knew of a substantial risk.  It is enough that the defendant *should* have been aware of the risk." 2019 U.S. Dist. LEXIS *19 (emphasis in original).[8]

In support of their motion to dismiss Plaintiff's gross negligence claims, Defendants cite only one case, *Elliott v. Carter*, 292 Va. 618 (2016), in which "the Virginia Supreme Court **affirmed summary judgment**" in favor of the defendant. Br. at 9 (emphasis added).  In that case, the Court specifically defined the issue as "the **evidence** required to submit a question of gross negligence to a **jury**." *Id*. at 620 (emphasis added); *see also Frazier v. City of Norfolk*, 234 Va. 388, 393 (1987) ("the question whether gross negligence has been established is a matter of fact to be decided by a jury").  Defendants' own brief quotes the *Elliott* court stating that "a claim for gross negligence must fail as a matter of law when **the evidence** shows that the defendants exercised some degree of care." Br. at 9 (emphasis added).  This case has not entered discovery and certainly is not at the point of summary judgment where evidence has been established.  Defendants provide no authority requiring this Court to dismiss Plaintiff's gross negligence claims at the pleadings stage.

---

she has likely also plausibly alleged a gross negligence claim. *Hixson v. Hutcheson*, No. 5:17-CV-032, 2019 U.S. Dist. LEXIS 11326 *19 (W.D. Va. Jan. 23, 2019).

[8] Additionally, "[s]everal acts of negligence which separately may not amount to gross negligence, when combined may have a cumulative effect of showing a form of reckless or total disregard for another's safety." *Chapman v. City of Virginia Beach*, 252 Va. 186, 190 (1996) (internal citations and quotation marks omitted).

Plaintiff meets the standard for gross negligence. The complaint is replete with facts sufficient to show that Defendants should have known of the risk of harm to Hoffler when they disregarded his abdominal pain and other acute symptoms.

### 1.   Plaintiff Plausibly Asserted Gross Negligence Claims Against Dr. Taylor

Dr. Taylor twice was called by Nurse Harrell in connection with Hoffler's dire condition. The first time was on the evening of October 17, when Hoffler reported **pain in his "testicles, then stomach, then appendix, back down to penis."** (emphasis added) ¶35 and Nurse Harrell wrote that Hoffler **"presents screaming, outburst, profusely sweating, pale in color, noticeable goose bumps (stating he's hot)."** ¶34 (emphasis added) and was **"screaming he needs to go to the ER."** ¶38.   Hoffler was unable to sit still for more than a few seconds, his pupils were moderately dilated, his nose was runny or tearing, he was "obviously" irritable or anxious, and he had "prominent" gooseflesh.  ¶37.  Hoffler reported that he felt like **he could not breathe**. ¶ 43.   And nothing about Hoffler's dire state improved with the provision of Gatorade or Motrin by Nurse Harrell.  ¶¶41, 49.  But Dr. Taylor made no effort to see Hoffler, nor did he order Nurse Harrell to perform any examinations or tests on Hoffler, or take any further action. ¶¶46-47. In complete disregard of the likely harms associated with leaving a person in Hoffler's condition unevaluated by a doctor and without medical stabilization, Dr. Taylor merely ordered that Hoffler be sent out of the Medical Department and placed in a camera cell. ¶47. Simply putting Hoffler in the camera cell provided no care or treatment for Hoffler's acute condition. The only thing it succeeded in doing was pushing Hoffler out of Medical, still in acute distress, but out of Medical's hair.  Monitoring, in and of itself, is no substitute for actual treatment (even if it had been properly done, which it was not in this case).  Similarly, when Dr. Taylor was contacted a second time *the next day*, he again failed to take any action to treat or diagnose Hoffler. ¶¶71, 73.  At that time, Hoffler was complaining of acute pain and difficulty breathing.

But Dr. Taylor once again did not come to see Hoffler and did not order him sent out to the hospital, or even kept in the Medical Department.  Dr. Taylor decided to let his gravely ill patient wait five hours alone in his cell. ¶¶71, 73.

Dr. Taylor did not see Hoffler until 12:10 a.m. on October 19, 2018, more than 30 hours after Nurse Harrell had first called him about Hoffler's condition. ¶79. Hoffler's condition was so dire that Dr. Taylor could not manually obtain a blood pressure or pulse. ¶82.  That fact should have immediately caused Dr. Taylor to send Hoffler to the emergency room, but he did not.  Dr. Taylor did not order any blood tests. ¶86.  He did not order any urine tests. *Id*.  He did not palpate Hoffler's abdomen, test for abdominal guarding, or test for rebound tenderness. ¶86.  The only indication that Dr. Taylor performed any sort of exam is his notation that Hoffler's abdomen was allegedly positive for bowel sounds.  However, Hoffler would be dead with widespread peritonitis later that same morning.  It is simply not probable that Hoffler actually had bowel sounds at this time; he would have had an acute surgical abdomen. ¶85.  Dr. Taylor either wrote that he assessed bowel sounds when he did not or he knowingly performed a deficient exam.  Dr. Taylor then abandoned Hoffler, sending Hoffler back to his cell while he was still in an emergent medical state, in extremis. ¶90.

### 2.      Plaintiff Plausibly Asserted Gross Negligence Claims Against Nurse Harrell

Nurse Harrell, as a medical professional, knew, or should have known, that symptoms— such as profuse sweating, pale skin color, extreme pain, dilated pupils, inability to breathe, and distress prompting screaming and begging to go to the ER—indicated that Hoffler needed emergent care when she saw him on October 17.  She knew, or should have known, the risk of disregarding the severity of symptoms such as Hoffler's.  Nurse Harrell merely offered Hoffler Gatorade and the over-the-counter medication Motrin – treatments that even reasonable lay people know are not likely to successfully treat such severe problems.  Moreover, even though

Hoffler's condition had not improved notwithstanding her chosen treatments and Dr. Taylor had not seen Hoffler, Harrell ignored Hoffler's continued distress upon his being placed in the camera cell. ¶¶40-44, 49.  Nurse Harrell exhibited gross negligence when she failed to take **any** action in response to seeing Hoffler in ongoing acute distress.  She did not even call Dr. Taylor back or see Hoffler again that day.

Nurse Harrell further acted with gross negligence when she saw Hoffler again the following day, October 18.  Nurse Harrell noted that Hoffler had a heart rate far exceeding the normal range at 7:15 am, and documented that he was in extreme pain, and was sweating profusely. ¶¶61-63.  But Nurse Harrell failed to contact Dr. Taylor and failed make *any* effort to treat Hoffler. ¶¶66-67.  Even after rechecking his pulse at 12:30 p.m., over five hours later, and finding it to still be above normal, Nurse Harrell made no effort to treat Hoffler and did not call the doctor. ¶¶65-67.  She simply dismissed Hoffler's presentation, and, thereafter, failed to check on him for six and a half hours. ¶67.

Harrell then ignored Hoffler's acute pain and condition when she saw Hoffler at 6:57 pm, choosing to focus on the PPD reading as though Hoffler were a normal inmate and not a person in acute distress.  Hoffler was then brought to Medical again to be assessed for pain at 7:20 p.m. that night, pain that Nurse Harrell had failed to treat previously. ¶69.  Once again, Nurse Harrell ignored the obvious pain Hoffler was in and consciously disregarded the risk of injury if his symptoms went untreated.  In response to his ongoing acute pain and trouble breathing, Nurse Harrell first gave him only fluids. ¶70.  The provision of fluids to Hoffler at that time would have been *excruciatingly* painful –such fluid would simply become additional content be leaked into his abdominal cavity and fuel his deadly peritonitis.  But Harrell ignored Hoffler's pain, failing to document his certain intense reaction to fluids and failing to inform Dr. Taylor of it.  ¶70.  Harrell gave Hoffler a breathing treatment, but no order by Dr. Taylor is noted, indicating that

Harrell acted without a physician's order. ¶73.  Either way, Harrell documented no assessment of the breathing and she sent Hoffler back to his cell again when he was in obvious, unresolved and severe distress, and did not follow up with him despite the order to monitor Hoffler.  She did not see him again prior to his being found unresponsive.  ¶¶73-75.  Reasonable people would certainly be "shocked" to find that Harrell treated a patient who continued to deteriorate before her in this callous manner, failing to send Hoffler to the hospital and failing to monitor him.

### 3.    Plaintiff Plausibly Asserted Gross Negligence Claims Against Nurse Thomas

Nurse Thomas only saw Hoffler once at some point between 5:35 p.m. on October 17, 2018 and 7:15 a.m. on October 18, 2018, notwithstanding orders to monitor him closely.  ¶¶56-57.  During that time, Hoffler was undergoing a deadly, abnormal and highly painful condition – corrosive digestive juices and food that were supposed to be routed elsewhere in the body were invading his abdominal cavity, killing tissue and causing infection. ¶¶6, 50-51.  Medical records surrounding Thomas's encounter with Hoffler show his unresolved distress and his deteriorating condition.  ¶¶ 34-35, 37, 41, 43, 58, 61-63.  But Thomas showed complete disregard for Hoffler.  Not only did she not bother to make complete or accurate records, but she provided no treatment to him whatsoever.  She simply left Hoffler in his cell, failing to call 911, call Dr. Taylor, or do anything at all to treat an acutely ill inmate – or elevate his care to someone who could treat him. ¶¶57, 126 a., c.  Healthcare providers certainly know, and should know, that if they do nothing to treat patients who are acutely ill, they are subjecting those patients to a grave risk of harm.

### 4.    *Elliott v. Carter* is Inapposite

Even utilizing the summary judgment standard set out in *Elliott*, dismissal would be improper.  Unlike the minor child Boy Scout peer leader in *Elliott* who was unaware of the "hidden danger posed by the sandbar" in the context of swimming in the river, 292 Va. at 623, these Defendants knew, or should have known, that disregarding Hoffler's pleas for assistance

and his acute medical condition would lead to serious injury, or in this case, death.  As medical professionals, Dr. Taylor, Nurse Harrell and Nurse Thomas's dismissal of Hoffler's acute medical symptoms and complaints shows a disregard of an obvious risk, not the surfacing of a "hidden danger." Further, the Boy Scout peer leader in *Elliott* reacted immediately to the decedent's distress and made an unfortunately unsuccessful "attempt to render assistance." *Id*. These Defendants, on the other hand, repeatedly disregarded Hoffler's dire situation.  Despite being medical professionals interacting with an extremely ill man, they dismissed his distress and never medically stabilized him.  Rather than receiving emergent care, Hoffler was repeatedly pushed out of the Medical Department and consigned to a cell for "monitoring" which never occurred.  Hoffler's condition was constantly minimized or completely ignored, even as it worsened under Defendants' care.  No effort was made to correct even Hoffler's dangerously low, un-measurable blood pressure and pulse or extremis.  Even under the heightened standard of *Elliott v. Carter*, dismissal would be not be warranted.

## F.      Plaintiff Has Plausibly Plead Willful and Wanton Negligence

Willful and wanton negligence is "action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another."  *Kaltman v. All American Pest Control, Inc.,* 281 Va. 483, 494 (2011) (quoting *Alfonso v. Robinson*, 257 Va. 540, 545 (1999)).

Defendants acted in conscious disregard of Hoffler's rights, or with reckless indifference to his health and safety, when they repeatedly failed to order blood tests, palpate his abdomen, medically stabilize him, or send him to an emergency room in an effort to diagnose and treat his acute illness which was deteriorating under their management.  Instead, Hoffler was returned to a purportedly monitored cell where he was not routinely checked on, and quickly dismissed by Dr.

Taylor during their one interaction.  His pain and continued severe symptoms were disregarded.

Plaintiff has met the willful and wanton negligence standard.  Plaintiff has pled numerous facts as to defendants that meet the legal threshold *for possibility of showing* negligence involving a conscious disregard for another's rights, reckless indifference to the consequences, and awareness that the conduct *probably* would cause injury to Hoffler.  It should be the province of the jury to make the ultimate decision.  For example, among other allegations made in the Complaint:

- Nurse Harrell consciously chose to ignore Hoffler's ongoing, significant distress when she placed him in the camera cell on October 17.  Not only had he presented to her with complaints of intense pain, profuse sweating, pale skin color, screaming and begging to go to the ER, dilated pupils, and stating he felt he could not breathe, symptoms that had not resolved or stabilized, but he had not been seen by the doctor and she observed him "sticking fingers down his throat trying to make himself vomit" upon going into the cell.  Hoffler's desperate need for medical care was apparent, but Harrell abandoned him.  ¶49.  There is no indication she checked on Hoffler again before ending her shift or even informed Dr. Taylor of the incident.

- Defendant Thomas certainly consciously chose to fail to treat Hoffler at all when encountering him at a time when the pathogenesis of his peritonitis on autopsy and his preceding and succeeding medical records indicate he was in extreme distress and an acute condition.  Thomas disregarded Hoffler so greatly that she did not even elect to fully or accurately fill in his COWS chart, much less provide him with help for his urgent state.  Thomas clearly had a choice to act on Hoffler's behalf, as he languished in a camera cell away from the Medical Department, but she chose not to do so.  ¶¶57, 126 a. and c.

- Nurse Harrell consciously chose to disregard Hoffler's tachycardia, complaints of pain, sweating, distress, enlarged pupils and abnormal movement on October 18, even notwithstanding her previous encounter with Hoffler.  ¶¶61-66.  She chose not to call the doctor and not to provide treatment or send Hoffler to the ER when encountered with extreme symptoms in a patient who had been suffering with an undiagnosed serious medical condition for some time.  Harrell further made a separate and equally reckless decision not to monitor Hoffler for hours thereafter.  ¶67.

- Nurse Harrell consciously chose on October 18 at 6:57 pm to focus on her routine PPD test duty rather than address Hoffler's continued, grave pain.  ¶68.

- Nurse Harrell consciously chose on October 18 at 7:20 pm to ignore the abnormal and intensely painful reaction that Hoffler undoubtedly had to the fluids she provided him, ¶¶70, 58, and to again return Hoffler to his cell and not monitor him thereafter.  ¶¶74-78.

- Dr. Taylor consciously chose not to see Hoffler for more than 30 hours notwithstanding the extreme symptoms communicated to him, including, among others, inability to breathe, profuse sweating, feeling hot while having noticeable goose bumps, appearing pale in color, acute pain causing screaming outbursts, and dilated pupils.  ¶¶34-47, 69, 71-74, 79.

- Dr. Taylor consciously chose to disregard the extreme danger to Hoffler in ignoring the dangerous inability to obtain a blood pressure or pulse, and in failing to address Hoffler's extremis. ¶¶84, 126b.  Hoffler was suffering an emergent condition – blood pressure and pulse so low they could not be measured – but Dr. Taylor sent Hoffler back to his cell instead of to the emergency room.

A reasonable person could find that these medical providers were aware that conscious disregard such as the foregoing who probably cause injury to Hoffler.  Acute medical conditions that are not timely and appropriately stabilized are commonly known to likely cause injury, a fact of which medical providers are specially trained to be aware.

**G.    The Complaint Adequately Asserts Bases for the Imposition of Punitive Damages**

The Defendants are liable for punitive damages because they consciously disregarded Mr. Hoffler's right to safety.  Punitive damages are allowable when there is "misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others." *Condo. Serv.*, 281 Va. at 579 (citing *Giant of Va. v. Pigg*, 207 Va. 679, 685).  In this case, Defendants acted with "reckless indifference to the consequences" of their actions and inactions. *Griffen v. Shively*, 227 Va. 317, 321 (1984).  As noted above, the medical professional defendants were aware, based on their "knowledge of existing circumstances and conditions," namely, Hoffler's presentation, "that [their] conduct probably would cause injury to another." *Id*. A plea of punitive damages is appropriate under these circumstances.  A deterrent is needed for jail medical professionals who act in this reckless manner towards inmates, who are especially vulnerable patients without the freedom to get a second opinion or even access medical care when they choose.

WHEREFORE, for the reasons stated herein, this Court should deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

BLANCHE ELIZABETH HECKER,
ADMINISTRATOR OF THE ESTATE OF
MICHAEL STEWARD HOFFLER,
DECEASED,


By:  _____/s/ Mark J. Krudys_____
                        Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: mkrudys@krudys.com

*Counsel for Plaintiff Blanche Elizabeth Hecker, Administrator of the Estate of
Michael Steward Hoffler, Deceased*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23ʳᵈ day of September, 2019, I will electronically file the foregoing pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jeff W. Rosen, Esq.
Pender & Coward
222 Central Park Avenue, Suite 400
Virginia Beach, VA 23462
jrosen@pendercoward.com
*Counsel for Defendants WTRJA, Taylor, Harrell, and Thomas*

_____ /s/ Mark J. Krudys

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: mkrudys@krudys.com

*Counsel for Plaintiff Blanche Elizabeth Hecker,*
*Administrator of the Estate of*
*Michael Steward Hoffler, Deceased*

31